UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| HERBERT A. CONLEY, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| *v.* | ) | No.1:06-cv-164 |
| | ) | *Edgar* |
| YELLOW FREIGHT SYSTEM, INC., | ) | |
| | ) | |
| *Defendant.* | ) | |

**MEMORANDUM**

Plaintiff Herbert A. Conley brings this wrongful termination action against his former

employer, Defendant Yellow Freight System, Inc. ("Yellow Freight").  Mr. Conley alleges that

he was terminated in violation of the Tennessee Public Protection Act ("TPPA"), Tenn. Code

Ann. § 50-1-304.  He also brings a common law claim of retaliatory discharge in violation of

public policy.

Yellow Freight moves for summary judgment dismissal of both of Mr. Conley's claims

[Court Doc. No. 11], and Mr. Conley opposes the motion for summary judgment [Court Doc.

No. 19].   After reviewing the record in the light most favorable to Mr. Conley, the Court finds

that Defendant's motion for summary judgment will be **GRANTED IN PART** and **DENIED IN**

**PART**.

**I.     Background**

The facts, seen in the light most favorable to the Plaintiff, are as follows.  Mr. Conley

began working for Yellow Freight sometime in 1987 as an over-the-road ("OTR") truck driver.

[Court Doc. Nos. 12-2, 21-2, collectively Deposition of Herbert A. Conley ("Conley Dep."), pp.

106-07].  Mr. Conley apparently performed his job well for several years.  On June 18, 2002 then Senator Fred Thompson sent Mr. Conley a letter congratulating him for driving over one million miles without a preventable accident.  [Court Doc. No. 19-2, Affidavit of Herbert A. Conley II ("Conley Aff. II"), Ex. B].  On August 3, 2002 the President of Yellow Freight sent a letter of congratulations to Mr. Conley regarding his 15 years of service with the company.  Conley Aff. II, Ex. A.  The letter states, "I commend you for your fine work and I wish you every success as you continue your career with Yellow."  *Id.*

In the fall of 2002, however, Mr. Conley began to experience employment difficulties.  In September of 2002, Jeff Kisor took over the position of general operations manager for Yellow Freight's Chattanooga terminal.  Conley Aff. II, ¶ 6; [Court Doc. No. 12-5, Affidavit of Herbert A. Conley I ("Conley Aff. I"), ¶ 6].  Around this time, Jeff Kisor and James Aiken, another Yellow Freight supervisor, began to admonish Mr. Conley "to the effect that [he] should take less time on [his] over the road runs."  *Id.*  On September 13, 2002 Mr. Conley attended a meeting with Terry Cobb, a Yellow Freight supervisor, and Wayne Shelton, another Yellow Freight truck driver.  *Id.*  At the meeting Mr. Cobb played a recording of a speech by the president of a competitor following the news that the competitor was ceasing to operate.  *Id.*  Mr. Conley believed the message of the meeting was that he was "indirectly but firmly advised to complete [his] runs more quickly."  *Id.*  Mr. Conley asserts that Mr. Cobb indicated that "if you're full in 30 minutes as opposed to an hour, he wanted us rolling" and that "no matter what it took, he wanted us–he wanted his wheels rolling."  Conley Dep., pp. 179-80.

Mr. Conley responded to this September 13th meeting by writing a letter to Mr. Cobb dated September 16, 2002.  The letter states:

It appears the main reason you wanted to meet with us was to encourage us to change our work habits. However, over my tenure with Yellow Freight Systems, I have received numerous awards, letters of commendation and complements on my safe and timely driving performance thus far. . . . My first and foremost goal is to complete each route following all Federal Motor Carrier Safety Regulations, specifically Code 392.3 . . . I believe you know where I stand on sacrificing safety performance as opposed to causing an accident, injury or both to myself or others. I will make every effort to comply with your wishes, but, I will not jeopardize myself or Yellow Freight to do so.

Conley Aff. II, Ex. C. Shortly after this letter to Mr. Cobb, Mr. Conley received a warning letter from James Aiken regarding his failure to "sign in and out properly and accurately" in accordance with the union agreement. *Id.* at Ex. D. The letter indicated that further violations of the sign-out policy would subject him "to more severe disciplinary action." *Id.* Section 42 of the union agreement states, "[d]rivers are required to sign in and sign out properly and accurately. This will be policed by the Employer and stewards. Failure to do so will result in: Warning letter (first (1st) occurrence), Three (3) day suspension (second (2nd) occurrence), and discharge (third (3rd) occurrence), subject to Article 45." [Court Doc. No. 12-2, Ex. 3].

The sign in sheet indicated that Mr. Conley had been dispatched from Charlotte, NC, instead of Atlanta, GA. Conley Aff. I, Ex. E. Mr. Conley asserts that he signed out of his place of origination that day, which was Charlotte, NC, but that he failed to sign out of his intermediate stop in Atlanta, GA. Conley Aff. I, ¶ 8. Mr. Conley also asserts that he never received "any instruction as to exactly how the sign in/sign out sheets should be completed." *Id.*

Mr. Conley admits that on October 8, 2002 he failed to complete the outbound sign-out sheet when he was dispatched from Chattanooga, TN to Charlotte, NC. *Id.* at ¶ 9. He received another warning letter from Yellow Freight dated October 11, 2002. *Id.* at Ex. F. The letter

indicated that Mr. Conley would receive a three-day suspension and that further violations of the policy would "result in more severe disciplinary action being taken, up to and including discharge." *Id.*

On November 5, 2002 Yellow Freight dispatched Mr. Conley from Atlanta, GA to Chattanooga, TN. Conley Aff. I, ¶ 10. Upon arriving at the Chattanooga terminal, Mr. Conley initially failed to sign in on the designated sign-in sheet. *Id.* Mr. Conley started to drive home. Before he reached his home, however, he recalled that he had not signed the sign-in sheet. He immediately returned to the Chattanooga terminal to sign the sheet. Upon his return to the terminal, Mr. Conley could not find the sign-in sheet in any of the locations he usually found it. *Id.* He entered the dispatch office and obtained a clean sign-in sheet and signed it. Conley Aff. II, Ex. H; Conley Dep., p. 223-25. He then left the sheet with his signature in the appropriate place in the terminal. Conley Aff. II, ¶ 10. Mr. Conley asserts that he signed in on the blank sign-in sheet within thirty minutes of his return to Chattanooga. *Id.* at ¶ 14. Mr. Conley's supervisor, Mr. Cobb, admitted that failing to sign in immediately upon arrival in the terminal "should be" permissible for as long as thirty minutes. [Court Doc. Nos. 12–3, 21-3, collectively Deposition of Terry Lee Cobb ("Cobb Dep."), p. 124].

On November 6, 2002 Yellow Freight sent Mr. Conley a letter indicating that he failed to sign in at the Chattanooga terminal upon his return on November 5, 2002. Conley Aff. II, Ex. I. The letter indicated that Mr. Conley was "being discharged" because it was his fourth offense for failing to sign in or out properly and accurately. *Id.* Yellow Freight retracted the third offense because its notice was defective. Conley Dep., pp. 130-34. The letter also stated, "[s]hould you elect to protest this discharge, you will continue to work as your seniority allows until such time

as the grievance Committee has rendered a decision." *Id.*

Mr. Conley received the letter on November 11, 2002 when he checked his post office box. Conley Aff. I, ¶ 13. Mr. Conley understood that under the Teamster's union agreement to which he and Yellow Freight were subject, the November 6, 2002 letter was treated as a conditional notice of "intent to discharge." *Id.* at ¶¶ 15, 16. Mr. Conley's supervisor, Jeff Kisor, also admitted that "at that point in time it wasn't a discharge, it was an intent to discharge." [Court Doc. No. 12-4, 21-4, collectively Deposition of Jeffrey Andrew Kisor ("Kisor Dep."), p. 83]. Mr. Kisor indicated that the "intent to discharge" was part of Yellow Freight's contract with the Teamster's union. *Id.* at p. 84. During a hearing before the Tennessee Department of Labor and Workforce Development, Mr. Kisor testified that Mr. Conley was employed with Yellow Freight until April 20, 2003. [Court Doc. 21-5, Affidavit of George Derryberry ("Derryberry Aff."), Ex. D].

Mr. Conley grieved the intent to discharge and continued working full-time with full pay and benefits. Conley Aff. I, ¶ 15. At the conclusion of a discharge hearing on April 23, 2003, Yellow Freight terminated Mr. Conley. *Id.*

Mr. Conley presents evidence that other Yellow Freight employees were treated more favorably than he for their failure to sign the sign in/sign out sheet or for their attempt to correct a failure to sign in. He presents the affidavits of two Yellow Freight truck drivers in support of his allegation that other employees were treated more favorably. Gerald Shelton attests that "I personally know that the 'sign in/sign out' rule described above has routinely and consistently been violated by Yellow Freight drivers, including myself, without being disciplined by Yellow Freight." [Court Doc. No. 19-3, Affidavit of Gerald Wayne Shelton ("Shelton Aff."), ¶ 7]. Mr.

Shelton asserts that Tony Simpson, an OTR driver, has frequently driven from Charlotte through Atlanta and on to Chattanooga without signing in or out in Yellow Freight's Atlanta terminal. *Id.* Mr. Shelton also asserts that Mr. Simpson has not been disciplined for his failure to sign in or sign out. *Id.* Mr. Shelton asserts that three other employees also have not been disciplined for their failures to sign in or sign out properly and accurately. *Id.* Mr. Shelton also asserts that he has violated the sign in/sign out policy himself intentionally and has not received any discipline. *Id.*

Mr. James Stockley, another Yellow Freight OTR truck driver, asserts that noncompliance with the sign in/sign out policy "has been widespread" and that no other employee to his knowledge has been terminated for repeated violations of the policy except for Mr. Conley. [Court Doc. No. 19-4, Affidavit of James Stockley, "Stockley Aff.", ¶¶ 4-5]. Mr. Conley also asserts that at least three other employees, Paul Martinetti, Karl Laue, and Joe Marion, have not been disciplined as severely for failing to sign in or sign out properly and accurately. Conley Aff. II, ¶ 18. He further alleges that Yellow Freight did not discipline Paul Martinetti for correcting an error on his sign in/sign out sheet. *Id.* at ¶ 19.

## II.    Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway*

*Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of the witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435-36. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 140 (6th Cir. 1997). If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir. 1995); *LaPointe v. UAW, Local 600*, 8 F.3d

376, 378 (6th Cir. 1993).

**III.    Analysis**

**A.    Statute of Limitations**

Claims under the TPPA and common law claims for retaliatory discharge in violation of public policy must be filed within one year from the date of the discriminatory act. *See Stewart v. Memphis Housing Authority*, 287 F.Supp.2d 853, 858 (W.D. Tenn. 2003); *Weber v. Moses*, 938 S.W.2d 387, 393 (Tenn. Sup. Ct. 1996); Tenn. Code Ann. § 28-3-104. Conley filed his initial complaint on March 1, 2004. Yellow Freight asserts that under the U.S. Supreme Court decisions in *International Union of Electrical Radio and Machine Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976) and *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), Mr. Conley's termination occurred when he received the November 6, 2002 letter and that the statute of limitations began to run on that date even though Conley continued working and receiving full pay and benefits through April of 2003. Yellow Freight thus contends that Conley's initial complaint was untimely.

In *Robbins & Myers*, the plaintiff was terminated from employment and filed a grievance related to her termination. 429 U.S. at 444-45. The plaintiff's grievance was processed through three steps, and then it was denied with a finding that the discharge complied with the terms of the collective bargaining agreement. *Id.* at 445. The plaintiff then filed a charge of racial discrimination with the Equal Employment Opportunity Commission ("EEOC") 84 days after the final denial of her grievance and 108 days from the date of her termination. *Id.* At that time the relevant statute required an aggrieved employee to file a discrimination charge within 90

days of the alleged discriminatory act.  *Id.*  The plaintiff argued that the discharge was

"tentative" and "non-final" until the denial of the grievance.  *Id.* at 446.  The Supreme Court

disagreed, noting that the plaintiff stopped work and ceased receiving pay and benefits as of the

date of the discharge.  *Id.*  It also found that there was "no indication that either party viewed the

October 25 discharge as anything other than 'final.'"  *Id.*  The Supreme Court held that the statute

of limitations began to run on the date of discharge and that the pendency of the grievance did

not toll the statute of limitations.  *Id.* at 447-49.  In making its determination, the Supreme Court

noted that "the parties could conceivably have agreed to a contract under which management's

ultimate adoption of a supervisor's recommendation would be deemed the relevant statutory

'occurrence,'" but they failed to do so.  *Id.* at 234.

In *Ricks* the Supreme Court addressed a situation involving a denial of academic tenure.

449 U.S. at 252.  In February 1973 the tenure committee of the defendant college recommended

that the plaintiff not receive tenure.  It then agreed to reconsider its decision the next year.  In

February 1974 the tenure committee again recommended that the plaintiff not receive tenure.  In

March of 1974, the Faculty Senate agreed with the tenure committee's recommendation.  On

March 13, 1974 the Board of Trustees "formally voted to deny tenure" to the plaintiff.  *Id.*  The

plaintiff filed a grievance with the college's grievance committee.  The college had a policy of

offering a "terminal" contract of one year to a faculty member who did not receive tenure, and it

offered such a "terminal" contract to the plaintiff on June 26, 1974.  *Id.* at 253.  On September

12, 1974 the Board of Trustees notified the plaintiff that it had denied his grievance.

The plaintiff filed a discrimination charge with the EEOC on April 28, 1975, and then

filed his lawsuit in September of 1977.  449 U.S. at 254.  The college moved to dismiss the

complaint as untimely. The plaintiff argued that the statute of limitations began to run on the last date of employment, or the last date of his terminal contract. *Id.* at 255-56. The Supreme Court disagreed and held that the "limitations periods commenced to run when the tenure decision was made and [the plaintiff] was notified." *Id.* at 259. The Supreme Court upheld the district court's determination that the statute of limitations began to run on June 26, 1974 when the Board of Trustees formally notified the plaintiff of the offer of a "terminal" contract and after the "tenure committee had twice recommended that [the plaintiff] not receive tenure; the Faculty Senate had voted to support the tenure committee's recommendation; and the Board of Trustees formally had voted to deny [the plaintiff] tenure." *Id.* at 262.

In the instant action, Conley continued to work and receive full pay and benefits even after he received the notice of "intent to discharge" dated November 6, 2002. Conley Aff., ¶ 15. The parties do not dispute that Mr. Conley was employed with Yellow Freight until April 2003. *Id.*; [Court Doc. No. 21-5, p. 13]. Mr. Kisor admits that the notice dated November 6, 2002 was an "intent to discharge" and not an actual discharge and that this point had been negotiated with the Teamsters union. Kisor Dep., pp. 83-85.

Yellow Freight also relies on *Weber v. Moses* for support of its position that Conley's claims are barred by the statute of limitations. 938 S.W.2d 387 (Tenn. Sup. Ct. 1996). In that case the Tennessee Supreme Court relied upon the *Ricks* decision, as well as *Chardon v. Fernandez*, 454 U.S. 6 (1981) in holding that "a discriminatory termination ceases and is complete, when the plaintiff is given unequivocal notice of the employer's termination decision, even if employment does not cease until a designated date in the future." 938 S.W.2d at 391-92. The court noted that "[a]n employee's hope for rehire, transfer, promotion, or a continuing

employment relationship cannot toll the statute of limitations absent some employer conduct likely to mislead an employee into sleeping on his rights." *Id.* at 392. In *Fahrner v. SW Manuf. Inc.* the Tennessee Supreme Court confirmed that the "discovery rule" applies to the accrual of the statute of limitations in retaliatory discharge cases. 48 S.W.3d 141, 144 (Tenn. Sup. Ct. 2001). As this court has recently explained the discovery rule, "the clock begins to run either when actual notice is received or when the plaintiff should have known of his injury by exercising reasonable diligence–*whichever is earlier*." *Cline v. BWXT-Y12, L.L.C.*, No. 304-cv-588, 2007 WL 1227482 *4 (E.D. Tenn. Apr. 24, 2007) (relying on *Fahrner*, 48 S.W.3d 141). However, statute of limitations analysis must also be conducted "on a case-by-case basis." *Cline*, 2007 WL 1227482 at *3 (citing *Ricks*, 449 U.S. at 258 n.9).

The Court finds that the facts of this case distinguish it from *Robbins & Myers*. In *Robbins & Myers* the Supreme Court noted that the parties could contract for a situation exactly like that present here: one in which "management's ultimate adoption of a supervisor's recommendation would be deemed the relevant statutory 'occurrence.'" 429 U.S. at 234. In addition, in *Robbins & Myers* the parties did not disagree about the date of discharge, and the plaintiff did not continue to receive full pay and benefits during the pendency of her grievance. *Id.* at 446. In this case, the parties agree that Mr. Conley did not cease working for Yellow Freight until April of 2003. Conley Aff. I, ¶ 15; [Court Doc. No. 21-5, p. 13].

The instant action is also distinguishable from *Ricks*. In *Ricks* a tenure committee had made two recommendations to deny tenure, a faculty senate had voted to approve the recommendation, the Board of Trustees formally voted to deny tenure, and the Board of Trustees notified the plaintiff of a formal offer of a "terminal" contract. In contrast, in the instant action,

the parties agree that the notice provided to Mr. Conley dated November 6, 2002 "wasn't a discharge, it was an intent to discharge. . ." Kisor Dep., p. 83.  Thus, both parties understood the notice did not constitute a final termination decision.  *Id.*, Conley Aff., ¶¶ 15-16.  The Court therefore concludes that the discriminatory act which commenced the running of the statute of limitations occurred on April 23, 2003 when Mr. Conley ceased working for Yellow Freight.  Conley Aff., ¶ 15.  His claims are thus timely.

**B.     STAA Pre-emption**

Yellow Freight argues that Conley's TPPA claim is pre-empted by the Section 405 of the federal Surface Transportation Assistance Act, 49 U.S.C. § 2305 ("STAA").  It relies principally on three decisions for support.  *See Watson v. Cleveland Chair Co.*, 789 S.W.2d 538 (Tenn. Sup. Ct. 1989); *Norman v. M.S. Carriers, Inc.*, 741 F.Supp. 148 (W.D. Tenn. 1990); *Davis v. Customized Transp. Inc.*, 854 F.Supp. 513 (N.D. Ohio 1994).  During the relevant time period, the STAA provided in relevant part:

> (a) Prohibitions. –(1) A person may not discharge an employee, or discipline or discriminate against an employee regarding pay, terms, or privileges of employment, because–
> (A) the employee, or another person at the employee's request, has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety regulation, standard, or order, or has testified or will testify in such a proceeding; or
> (B) the employee refuses to operate a vehicle because–
> (i) the operation violates a regulation, standard, or order of the United States related to commercial motor vehicle safety or health; or
> (ii) the employee has a reasonable apprehension of serious injury to the employee or the public because of the vehicle's unsafe condition; . . .
> (2) Under paragraph (1)(B)(ii) of this subsection, an employee's apprehension of serious injury is reasonable only if a reasonable individual in the circumstances then confronting the employee would conclude that the unsafe condition establishes a real danger of accident, injury, or serious impairment to health.  To qualify for protection, the employee must have sought from the employer, and been unable to obtain, correction of the hazardous safety or security condition.

49 U.S.C. § 31105(a)(1).  The STAA also provides for a grievance procedure for filing charges

with the Secretary of Labor, as well as a procedure for investigation and resolution by the

Secretary.  *See* 49 U.S.C. § 31105(b).  The STAA also provides for judicial review of the

Secretary's determination.  *See* 49 U.S.C. § 31105(c)-(d).  Congress recently revised the STAA,

and the revised statute became law on August 3, 2007.  *See* Implementing Recommendations of

the 9/11 Commission Act of 2007, Pub.L. No. 110-53, § 1536, 121 Stat. 266, 464 (Aug. 3, 2007).

The revised STAA provides that "[n]othing in this section preempts or diminishes any other

safeguards against discrimination, demotion, discharge, suspension, threats, harassment,

reprimand, retaliation, or any other manner of discrimination provided by Federal or State law."

49 U.S.C. § 31105(f).

  In *Watson* the Tennessee Supreme Court addressed the plaintiffs' complaints that their

employer forced them to violate highway safety regulations regarding maximum driving times.

789 S.W. 2d at 539.  The defendant claimed that the STAA pre-empted plaintiffs' common law

claim for retaliatory discharge.[1]  The Tennessee Supreme Court reviewed federal law on pre-

emption and determined that the STAA pre-empted the plaintiffs' claims.  The court reviewed

Section 405 providing for investigation and resolution by the Secretary of Labor.  It noted:

> [i]t is evident from the provisions of the Act that Congress did not merely lay
> down a substantive rule of law to be enforced by any tribunal competent to apply
> law generally to the parties.  It went on to confide the primary interpretation and
> application of its rules to a specific and specially constituted tribunal and
> prescribed a particular procedure for investigation, complaint and notice, and
> hearing and decision . . . . We are of the opinion that Congress, explicitly and
> implicitly, confined jurisdiction under the Act to the administrative and judicial
> procedures to be exercised by the *Secretary of Labor* in accordance with § 405.

---

[1] The Tennessee Supreme Court decided *Watson* prior to the enactment of the TPPA in
1990.

*Watson*, 789 S.W.2d at 544.  The Tennessee Supreme Court also felt "fortified" in its conclusion

that the STAA pre-empted the plaintiffs' claims because it was unaware of any state that had

asserted concurrent jurisdiction over claims brought under the STAA.  *Id.*

Following *Watson* in 1990, a Tennessee federal district court again faced the question of

whether the STAA preempted Tennessee law.  *Norman v. M.S. Carriers, Inc.*, 741 F.Supp. 148

(W.D. Tenn. 1990).  The plaintiff in *Norman* claimed that his employer required him to violate

Federal Motor Carrier Safety regulations regarding maximum driving times.  *Id.* at 149.  After

reviewing Section 405's complaint and investigation procedure, the district court held that "[i]t is

evident from the above language that Section 405 is a comprehensive remedial provision.

Although there is no express language in the Act, this Court concludes that Congress has

implicitly confined jurisdiction over claims such as plaintiff's to the Secretary of Labor."  *Id.* at

150.  The district court analogized the STAA to an almost identical provision in the Energy

Reorganization Act of 1974 ("ERA"), 42 U.S.C. §§ 5801 *et seq.*  It found that since the Fifth and

Tenth Circuits had held that the analogous ERA complaint provision was an exclusive remedy,

its conclusion that the STAA was an employee's exclusive remedy was bolstered.  *Id.*

Finally, Yellow Freight relies on *Davis v. Customized Transp. Inc.*, for support of its

position.  854 F.Supp. 513 (N.D. Ohio 1994).  In *Davis* the plaintiff also complained that his

employer urged him to violate the Federal Motor Carrier Safety Regulations.  *Id.* at 515.  In

*Davis* the district court held:

> [t]his court agrees with the holding of the district court in *Norman* that a state law
> claim involving a discharge in retaliation for an employee refusing to violate
> Federal Motor Carrier Safety Regulations is inconsistent with the procedural
> remedies and purpose of the STAA.  Accordingly, the administrative procedure in
> Section 405 of the STAA provides the exclusive remedy for plaintiff's state law
> claims, and his claim is preempted.

-14-

*Id.* at 518.

Similarly, in *Barlow v. Martin-Brower Co.*, the district court held that the STAA pre-empted the employee's state law claims relating to his employer's urging him to violate the Federal Motor Vehicle Carrier Regulations. No. 3:98cv456, 1998 WL 34202237 (W.D. Ky. Oct. 22, 1998). The Sixth Circuit affirmed the district court's decision on different grounds, finding that plaintiff's allegations did not violate public policy as defined by Kentucky law, and it did not address whether STAA pre-empted all state law claims. *Barlow v. Martin-Brower Co.*, No. 98-6542, 2000 WL 32027 (6th Cir. June 5, 2000).

As Mr. Conley points out, several other courts have held that the STAA does not pre-empt state law claims for retaliatory discharge. For example, in *Parten v. Consolidated Freightways Corp.*, the Eighth Circuit held that the STAA did not pre-empt an employee's claim for violation of public policy under Minnesota law. 923 F.2d 580 (8th Cir. 1991). After reviewing the law of federal pre-emption, the Eighth Circuit determined that the "state remedy is a complementary remedy which does not conflict with section 405." *Id.* at 583.

Similarly, in *Briones v. Ashland, Inc.*, the district court held that the STAA did not pre-empt a state law claim for wrongful discharge. 164 F.Supp.2d 228 (D. Mass. 2001). The court noted that the STAA states that a charge alleging a safety violation *may* be filed with the Secretary of Labor. *Id.* at 231. The court also reviewed the STAA's legislative history and found that:

> the legislative history strongly supports the contention that Congress did not intend to preempt state law. During the debate on the enactment of the STAA, Senator Charles Percy expressed his concern surrounding the preemptive effect of the STAA over "other avenues of relief and remedies that might be available to employees under union contracts, or statutory or common law." In response, Senator John Danforth, the principal author of the STAA, answered that "the

driver protection provisions of title IV are most certainly intended to strengthen, not displace, any existing remedies employees may have at law." These excerpts indicate that the STAA was not enacted to preempt state law remedies for retaliation against an employee who refuses to violate safety provisions.

*Id.* at 231-32 (quoting Cong. Rec., 32511 (daily ed. Dec. 19, 1982)).

Several other federal and state courts have held that the STAA does not pre-empt state law retaliatory discharge claims. For example, in *Bliss v. Stow Mills, Inc.*, the Supreme Court of New Hampshire explicitly disagreed with *Davis, Norman*, and *Watson* by noting that "these cases fail, in large part, to engage in a complete analysis of the statute's language, related regulations and legislative history. We, therefore, concur with the jurisdictions that hold that state law claims for wrongful discharge are not preempted by the STAA." 786 A.2d 815, 820 (2001). *See also*, *Glasscock v. Alliant Foodservice, Inc.*, 232 F.Supp.2d 1148, 1153-54 (D. Oregon 2001) (STAA does not pre-empt state law claim of retaliation); *Whitworth v. TNT Bestway Transp. Inc.*, 914 F.Supp. 1434, 1436 (E.D. Tex. 1996) (STAA does not pre-empt employee claim of retaliatory discharge, noting that "STAA was meant to act as a floor and not a ceiling of protection"); *Germann v. Vulcan Materials Co.*, 106 F.Supp.2d 1010, 1015 (S.D. Cal. 2000) (relying on legislative history in finding that STAA does not pre-empt state claim for wrongful termination in violation of public policy); *Todd v. Frank's Tong Service, Inc.*, 784 P.2d 47, 50 (Okla. Sup. Ct. 1989) (same); *Equal Employment Opportunity Comm'n v. International Paper Co.*, No. 91-2017-L, 1992 WL 370850 (D. Kan. Oct. 28, 1992) (same). In *Dobberowsky v. Cryogenic Transp., Inc.*, the district court refused to allow removal of a state whistleblower protection act claim pursuant to the STAA and left open the question of whether the STAA pre-empted the state law claim. 989 F.Supp. 848 (E.D. Mich. 1997).

The United States Supreme Court has explained the parameters of federal pre-emption in

numerous cases.  In *English v. General Electric Co.*, it summarized those parameters:

> Our cases have established that state law is pre-empted under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, in three circumstances.  First Congress can define explicitly the extent to which its enactments pre-empt state law.  Pre-emption fundamentally is a question of congressional intent, and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.
> Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively.  Such an intent may be inferred from a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." . . .  "Where . . . the field which Congress is said to have pre-empted" includes areas that have "been traditionally occupied by the States," congressional intent to supersede state laws must be " 'clear and manifest.'"
> Finally, state law is pre-empted to the extent that it actually conflicts with federal law.  Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

496 U.S. 72, 78-79, 110 S.Ct. 2270, 2275 (1990) (citations and quotations omitted).  In *English* the Supreme Court held that the ERA, the statute relied upon in *Norman*, did not pre-empt a state law claim for intentional infliction of emotional distress.  *Id.* at 90, 110 S.Ct. at 2281.  The Supreme Court has also made it clear that "[t]he critical question in any preemption analysis is always whether Congress intended that federal regulation supersede state law."  *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 369, 106 S.Ct. 1890 (1986); *see also, Verizon North v. Strand*, 309 F.3d 935, 940 (6th Cir. 2002).

As further support for his position, Conley points out that federal regulations implementing Section 405 of the STAA provide that:

> An employee who files a complaint under section 405 of the Act may also pursue remedies under grievance arbitration proceedings in collective bargaining

agreements. In addition, the complainant may concurrently resort to other agencies for relief, such as the National Labor Relations Board. The Secretary's jurisdiction to entertain section 405 complaints, to investigate, and to determine whether discrimination has occurred, is independent of the jurisdiction of other agencies or bodies. . . .

29 C.F.R. § 1978.112(a). Conley argues that this provision suggests that complaints pursuant to Section 405 are intended to combine with other avenues of relief, not pre-empt them. *See e.g., Bliss*, 786 A.2d at 819.

This court recognizes that a Tennessee state court and two district courts within this Circuit have found that the STAA pre-empts employee state law claims of retaliation. However, the parties have not directed this court to a Sixth Circuit case on the issue, nor has this court found one. In addition, these cases ignore the relevant legislative history. After reviewing the cases from other states and Circuits, this court concludes that those cases that hold that the STAA does not pre-empt state law offer the correct interpretation of the STAA due to their focus on congressional intent. Indeed, Congress just recently amended the STAA to clarify that state law claims are not pre-empted by the STAA. *See* 49 U.S.C. § 31105(f). This Court concludes that Mr. Conley's claims are not preempted by the STAA.

**C.     Labor Management Relations Act Pre-emption**

Yellow Freight argues that the Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, preempts Conley's claim. In *Lingle v. Norge Division of Magic Chef, Inc.*, the U.S. Supreme Court held "that an application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947 only if such application requires the interpretation of a collective-bargaining agreement." 486 U.S. 399, 413, 108 S.Ct. 1877 (1988). In that case the Court determined that a state law claim of retaliation for filing a workers'

compensation claim was not pre-empted by Section 301 of the LMRA. The Court summarized

its prior holdings regarding Section 301 pre-emption:

> if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles–necessarily uniform throughout the Nation–must be employed to resolve the dispute.

*Id.* at 405-06 (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904 (1985)). The

Court then analyzed the elements of retaliatory discharge under Illinois law and found that the

elements did not require "a court to interpret any term of a collective-bargaining agreement" and

that the employer's defense "likewise does not turn on the meaning of any provision of a

collective-bargaining agreement." *Lingle*, 486 U.S. at 407. The Court concluded:

> For while there may be instances in which the National Labor Relations Act pre-empts state law on the basis of the subject matter of the law in question, § 301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements.
>
> In other words, even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 pre-emption purposes.

*Id.* at 408-10.

The Sixth Circuit has formulated a two-part test to determine whether a state law claim is

sufficiently "independent" to withstand Section 301 pre-emption. *See Mattis v. Massman*, 355

F.3d 902, 906 (6th Cir. 2004).

> First, courts must determine whether resolving the state-law claim would require interpretation of the terms of the collective bargaining agreement. If so, the claim is preempted. Second, courts must ascertain whether the rights claimed by the plaintiff were created by the collective bargaining agreement, or instead by state

> law.  If the rights were created by the collective bargaining agreement, the claim
> is preempted.  In short, if a state-law claim fails *either* of these two requirements,
> it is preempted by § 301.

*Id.* at 906 (citing *DeCoe v. General Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994)).  In *Alongi v.*

*Ford Motor Co.*, the Sixth Circuit applied this two-part test and determined that Section 301 did

not pre-empt plaintiffs' claim under Michigan law for retaliatory discharge in violation of public

policy.  386 F.3d 716, 726 (6th Cir. 2004).  The Court analyzed the elements of the Michigan

state claim and determined that the elements did not "make any reference to the terms of a

collective bargaining agreement."  *Id.  See also, Smolarek v. Chrysler Corp.*, 879 F.2d 1326,

1331 (6th Cir. 1989) (holding that Section 301 did not pre-empt retaliatory discharge claim);

*Dougherty v. Parsec, Inc.*, 872 F.2d 766, 771 (6th Cir. 1989) (holding plaintiff's state law claim

for tortious interference with contract by recommending discharge not pre-empted by Section

301).

  Yellow Freight relies on *Klepsky v. United Parcel Service, Inc.* in support of its position

that because Conley has requested reinstatement as part of his damages, Section 301 pre-empts

his claims.  No.05-4391, 2007 U.S. App. LEXIS 13703 (6th Cir. June 12, 2007).  In *Klepsky* the

Sixth Circuit held, in an unpublished opinion, that "[e]ven if he does not explicitly rely on terms

of the CBA pertaining to reinstatement, his request for reinstatement would, at a minimum, seem

to implicate such rights and require interpretation of the CBA.  For this reason, we find that

preemption exists under the LMRA, and that removal based on federal jurisdiction was proper

here."  *Id.* at *12.  However, since Yellow Freight filed its motion for summary judgment, this

court has granted Conley's request to amend his complaint to remove his request for

reinstatement from his damages request.  *See* [Court Doc. No. 30].  Thus, Yellow Freight's

argument regarding Conley's request for reinstatement no longer applies.

The court concludes that Section 301 of the LMRA does not pre-empt Conley's claims. Under the TPPA, a plaintiff must prove the following elements to establish a claim of retaliatory discharge: (1) status as an employee of defendant; (2) a refusal to participate in, or stay silent about, illegal activities; (3) termination of the plaintiff; and (4) an "exclusive causal relationship between his refusal to participate in or remain silent about illegal activities" and the termination. *See Southmayd v. Apria Healthcare, Inc.*, 412 F.Supp.2d 848, 862 (E.D. Tenn. 2006); *Griggs v. Coca-Cola Employees' Credit Union*, 909 F.Supp. 1059, 1063 (E.D. Tenn. 1995); Tenn. Code Ann. 50-1-304(a).

The elements of a common law claim of retaliatory discharge are different from the elements of a TPAA claim. *See Southmayd*, 412 F.Supp.2d at 862 (E.D. Tenn. 2006). Retaliatory discharge requires a plaintiff to show that: "(1) an employment-at-will relationship existed; (2) he was discharged; (3) the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in [defendant's] decision to discharge him was his exercise of protected rights or compliance with clear public policy." *Southmayd*, 412 F.Supp.2d at 862 (citing *Crews v. Buckman Laboratories Int'l. Inc.*, 78 S.W.3d 852, 862 (Tenn. Sup. Ct. 2002)). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to demonstrate a "legitimate nonpretextual nonretaliatory reason for the discharge." *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn. Sup. Ct. 1993).

Conley's demonstration of the elements supporting his prima facie case do not require

any interpretation of Yellow Freight's collective bargaining agreement.  Although Yellow Freight's defense is that it had a legitimate, non-retaliatory reason for discharging him because Conley violated the sign in/sign out policy established by the collective bargaining agreement, this defense alone does not require pre-emption.  The Court concludes that this is the sort of tangential reference to a collective bargaining agreement that does not establish Section 301 pre-emption because this court will not be required to interpret the terms of the collective bargaining agreement.  *See Lingle*, 486 U.S. at 413 n.12.  The question remains a factual one pertaining to Yellow Freight's motivation for terminating Mr. Conley, not whether its interpretation of the collective bargaining agreement is correct as a matter of federal labor law.  *See Smolarek*, 879 F.2d at 1334.  Further, Conley's right arises from state law, not from the collective bargaining agreement.  *See DeCoe*, 32 F.3d at 216.  Thus, the LMRA does not pre-empt Conley's TPPA claim and retaliatory discharge claim.

**D.** **Retaliatory Discharge Claims**

The TPPA is cumulative to a common law claim of retaliatory discharge.  *Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 537 (Tenn. Sup. Ct. 2002).  Thus, a plaintiff can state a claim for retaliation pursuant to the TPPA, as well as a common law claim of retaliatory discharge. The elements of a prima facie case for each claim differ.

**1.** **TPPA Claim**

The TPPA states in relevant part:

(a) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities. . . .
(c) As used in this section, "illegal activities" means activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare.
(d) (1) Any employee terminated in violation of subsection (a) shall have a cause

of action against the employer for retaliatory discharge and any other damages to
which the employee may be entitled.

Tenn. Code Ann. § 50-1-304; *see also, Guy*, 79 S.W.3d at 535.  To state a prima facie case under

the TPPA, a plaintiff must show: "(1) his status as an employee of the defendant employer; (2)

his refusal to participate in, or remain silent about, 'illegal activities' as defined under the Act;

(3) his termination; and (4) an exclusive causal relationship between his refusal to participate in

or remain silent about illegal activities and his termination." *Franklin v. Swift Transp. Co.*, 210

S.W.3d 521, 528 (Tenn. Ct. App. 2006) (citing *Crews v. Buckman Laboratories Int'l, Inc.*, 78

S.W.3d 852, 862 (Tenn. Sup. Ct. 2002)).  The Tennessee Supreme Court has discussed the

burden of proof at the summary judgment stage for a claim of retaliatory discharge:

> Where . . . the claim is one alleging retaliatory discharge and the essential factor
> to be determined is the employer's motivation, direct evidence of that motivation
> is rarely within the plaintiff's possession.  Consequently, the reviewing court
> must make a determination of whether the "proffered admissible evidence shows
> circumstances that would be sufficient to permit a rational trier of fact to infer a
> [retaliatory] motive.  It is not the province of the summary judgment court itself to
> decide what inferences should be drawn."  The evidence of causation must be
> viewed in the light most favorable to the nonmoving party and all reasonable
> inferences must be made in that party's favor.  The burden of proof rests upon the
> plaintiff to prove a causal relationship between the plaintiff's whistleblowing
> activity and the termination of employment.  If the plaintiff is able to demonstrate
> this causal link, the employer then bears the burden of showing a "legitimate,
> non-pretextual reason for the employee's discharge."  Summary judgment should
> be granted only when the facts and inferences drawn from those facts permit a
> reasonable person to reach only one conclusion.

*Guy*, 79 S.W.3d at 534 (quoting *Mason v. Seaton*, 942 S.W.2d 470, 473-74 (Tenn. Sup. Ct. 1997)

(citing *Anderson*, 857 S.W.2d at 558-59 (other citations omitted)).  In addition, Tennessee courts

have determined that "[t]he clear meaning of the statute is that employees have the absolute right

to speak out about illegal activities in their workplaces."  *Mason*, 942 S.W.2d at 476.

    In this case Mr. Conley presents sufficient evidence of a prima facie case under the

TPPA. The parties do not dispute that he was an employee of Yellow Freight. Although Yellow Freight argues that insufficient evidence of the second prong of the prima facie case exists, this court disagrees. The Federal Motor Carrier Safety Regulations provide in relevant part:

> No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle.

49 C.F.R. § 392.3; *see also* 49 C.F.R. § 395.3 (establishing maximum driving times); 49 C.F.R. § 392.6 (motor carriers may not schedule runs requiring the violation of speed limits). The TPPA defines "illegal activities" to include federal regulations intended to protect the public health, safety, or welfare. Tenn. Code Ann. § 50-1-304(c). The Federal Motor Carrier Safety Regulations clearly qualify as federal regulations intended to protect the public health, safety, and welfare.

Yellow Freight argues that it never explicitly asked Conley to violate this regulation or any other safety regulation or conduct any illegal activity. However, at the summary judgment stage, the court must view the facts in the light most favorable to Conley. Employers rarely state their illicit motivations explicitly. *See e.g. Guy*, 79 S.W.3d at 534; *Mason*, 942 S.W.2d at 474. Mr. Conley presents evidence in the form of his own affidavit, as well as Wayne Shelton's affidavit that suggests that Yellow Freight managers strongly implied that Conley "should take less time on [his] over the road runs." Conley Aff. II, ¶ 6. Conley and Shelton both point to a very specific meeting on September 13, 2002 in which Terry Cobb made clear to both of them that Conley was "indirectly but firmly advised to complete [his] runs more quickly." *Id.*; *see also* Shelton Aff., ¶ 9. Mr. Conley's letter to Mr. Cobb dated September 16, 2002 lends further

credence to his allegations, as it demonstrates his understanding that Mr. Cobb's implication in the meeting was for him to make shorter runs. Further, Mr. Conley wrote the letter prior to this lawsuit or any other adverse action against him had occurred. *See* Conley Aff. II, ¶ 7, Ex. C. Thus, there is evidence from which a jury could conclude that Mr. Conley has established the second prong of his prima facie case under the TPPA.

The parties do not dispute that Yellow Freight ultimately terminated Conley. Therefore, Mr. Conley has presented evidence of the third prong of his prima facie case under the TPPA. The parties dispute whether Mr. Conley has demonstrated a genuine issue of material fact regarding the fourth prong of the prima facie case–i.e. that retaliation was the exclusive cause of Mr. Conley's termination. However, although the court recognizes that under the TPPA, Mr. Conley must demonstrate that Yellow Freight discharged him *solely* because of his refusal to violate the Federal Motor Carrier Safety regulations, the court concludes that the evidence raises an issue of material fact regarding whether retaliation was the sole cause of his termination.

In August of 2002, the President of Yellow Freight sent Mr. Conley a letter congratulating him on his "fine work" during his 15 years of service. Conley Aff. II, Ex. A. In June of 2002, then Senator Fred Thompson sent Mr. Conley a letter congratulating him for driving over one million miles without a preventable accident. Conley Aff. II, Ex. B. These letters demonstrate that immediately prior to his conversation with Cobbs and his letter to Cobbs in response, Mr. Conley received praise of his job performance.

However, immediately following Mr. Conley's letter to Cobbs, Yellow Freight began to take an unusually strong interest in his compliance with the sign in/sign out policy. Mr. Conley presents evidence that other employees who committed the same infractions related to the sign

in/sign out policy were not disciplined as harshly as he. *See* Shelton Aff., ¶ 7(a)-(f). The evidence indicates that the alleged comparators were all OTR truck drivers who engaged in precisely the same violation as Mr. Conley did without being disciplined as severely. Shelton Aff., ¶ 7(a)-(f). In fact, the evidence suggests that no employee other than Conley has ever been terminated for violating the sign in/sign out policy, even though such violations are routine and rampant. *See* Shelton Aff., ¶ 7(a)-(f); Stockley Aff., ¶¶ 4-5.

Yellow Freight does not submit evidence that any other employees were disciplined as severely for engaging in the same behavior that Mr. Conley did, although Mr. Conley submits evidence in the form of Mr. Shelton's affidavit and Mr. Conley's affidavit that specific employees engaged in identical behavior. Mr. Cobb and Mr. Kisor could not remember another employee aside from Mr. Conley who was ever terminated for failing to sign in or out properly and accurately. Cobb Dep., p. 72; Kisor Dep., p. 75. For purposes of this motion, the court concludes that Mr. Conley states a prima facie case for his TPPA claim. Yellow Freight urges this court to rely on Conley's admission that he violated the sign in/sign out policy on occasion as proof that retaliation could not have been the *sole* cause of his termination. This might be a persuasive argument if Yellow Freight could demonstrate that any other employee had ever been disciplined as severely or discharged for violation of a policy which the evidence suggests was routinely disregarded by all employees.

The burden now shifts to Yellow Freight to demonstrate evidence of a legitimate, nondiscriminatory reason for terminating Mr. Conley. The Court concludes that it has satisfied its burden. Yellow Freight presents evidence that it terminated Mr. Conley for three violations of its sign in/sign out policy. Conley Aff. II, Ex. I.

The burden then shifts back to Mr. Conley to demonstrate evidence of pretext. While Mr. Conley does not present direct evidence of retaliation, he does present evidence that Yellow Freight's alleged non-retaliatory reason for terminating him was a pretext. There is substantial evidence of other employees engaging in identical violations of the union policy on numerous occasions while driving the same routes as Conley without repercussion. *See* Shelton Aff.; Stockley Aff. There is evidence that Mr. Conley never received training on how to complete the sign in/sign out sheets. Conley Aff. I, ¶ 8. Nor does Yellow Freight present evidence that it trained employees on proper completion of the sheets. There is also evidence that the sign in/sign out sheets were not always in a location where an employee could find them. Kisor Dep., pp. 100-01; Conley Dep., p. 225. Evidence also exists that Yellow Freight provided Mr. Conley with a fourth warning that was inaccurate. Conley Dep. pp. 130-34. This fact could lead to an inference that Yellow Freight was quick to analyze Mr. Conley's every move to substantiate the required number of violations of the policy to justify its termination. The evidence further suggests that Mr. Conley attempted to correct the alleged third violation of the policy within 30 minutes of his return to the Chattanooga terminal on November 5, 2002 and that his manager did not consider a 30 minute delay to be significant. Conley Dep., pp. 223-28; Cobb Dep., p. 124. Further, there is also testimony that the sign in/sign out policy was not consistently monitored and that it existed because the union insisted upon it, not because Yellow Freight desired it. Shelton Aff., ¶¶ 5, 7. This evidence creates a genuine issue of material fact regarding whether Yellow Freight's reasons for termination actually motivated the discharge. For these reasons, Yellow Freight's motion for summary judgment on Conley's TPPA claim will be DENIED.

**2.      Common Law Retaliatory Discharge Claim**

The prima facie elements of a common law claim of retaliatory discharge are:

(1) that an employment-at-will relationship existed; (2) that [plaintiff] was discharged; (3) that the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge him was his exercise of protected rights or his compliance with clear public policy.

*Franklin*, 210 S.W.3d at 528 (citing *Crews*, 78 S.W.3d at 862).

Conley argues that employment-at-will status is not a necessary element of a common law claim of retaliatory discharge. This court disagrees. Employment-at-will status is listed in numerous state and federal district court decisions defining the elements of Tennessee's common law claim of retaliatory discharge in violation of public policy. *See e.g., Turner v. Liberty Nat. Life Ins. Co.*, 488 F.Supp.2d 672, 677 (M.D. Tenn. 2007); *Yates v. Hertz Corp.*, 285 F.Supp.2d 1104, 1110-11 (M.D. Tenn. 2003); *Crews*, 78 S.W.3d at 862; *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716-17 (Tenn. Sup. Ct. 1997). Indeed, this court has defined the elements of a common law claim of retaliatory discharge in violation of public policy as requiring employment-at-will status on several occasions. *See e.g., Eppes v. Enterprise Rent-a-Car Co. of Tennessee*, No. 3:05cv458, 2007 WL 1170741, at *10 (E.D. Tenn. Apr. 18, 2007); *Carson v. AJN Holdings*, No. 3:05cv294, 2006 WL 3361749, at *6 (E.D. Tenn. Nov. 20, 2006); *Cate v. City of Rockwood*, No. 3:02cv611, 2006 WL 1129382, at *6 (E.D. Tenn. Apr. 27, 2006); *Weathers v. Bi-Lo, LLC*, No. 3:04cv367, 2006 WL 435725, at *5 (E.D. Tenn. Feb. 22, 2006); *Southmayd v. Apria Healthcare, Inc.*, 412 F.Supp.2d 848, 862 (E.D. Tenn. 2006).

This court agrees with Mr. Conley that very few Tennessee cases address the reasons of why only employees employed at-will are covered by this common law cause of action.

However, the court is not at liberty to second-guess the decisions of Tennessee's highest court with respect to Tennessee common law. Nor is it willing to ignore its own decisions clearly defining the elements of this claim as requiring employment-at-will. Therefore, because Conley cannot demonstrate that Yellow Freight employed him at-will, this court will dismiss his common law retaliatory discharge claim for failure to state a prima facie case.

**V.      Conclusion**

As explained *supra*, Yellow Freight's motion for summary judgment will be **GRANTED IN PART** and **DENIED IN PART**. This court will **DISMISS** Plaintiff's common law claim for retaliatory discharge in violation of public policy. This court will **DENY** Yellow Freight's motion for summary judgment regarding Plaintiff's claim for violation of the TPPA.

A separate order will enter.

<u>        */s/ R. Allan Edgar*        </u>
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE